UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>    )<br>Plaintiff-Appellee, )<br>    )<br>v. )<br>    )<br>HOLLY WAZELLE, )<br>    )<br>Defendant-Appellant, )<br>_____ ) | NO. CR-F-04-5376 AWI<br>MAG. NO. 03-0271<br><br>ORDER RE: APPEAL |

This matter is before the court on an appeal of a Magistrate Judge's guilty verdict in a misdemeanor bench trial.

## I. History

On November 30, 2003, Yosemite National Park Ranger Michael Foster ("Foster") was "running radar" on Highway 41 inside Yosemite National Park near the Wawona Tunnel. E.R. 32.[1] At approximately 2:30 PM Foster observed, with radar, a red Pontiac, traveling north through the tunnel at 59 miles per hour in a 35 mile per hour zone. E.R. 34. Foster then activated his overhead lights and pursued the Pontiac into the tunnel. E.R. 35. The Pontiac made a left turn immediately following the tunnel, stopping in the Discovery View parking area. E.R. 35.

---

[1] Excerpts of Record ("E.R.") are lodged as attachments to Doc. 16.

1

1   The Discovery View parking area is the first area that provides a view into Yosemite Valley
2   when traveling north on Highway 41. E.R. 37.  The area is particularly popular as it provides
3   views of Bridalveil Falls, El Capitan, and Half Dome. E.R. 37.  Foster estimated at the time of
4   the traffic stop 200 people were present in the parking area. E.R. 37.  The Pontiac parked near the
5   end of the lot, close to the area where visitors take pictures of Yosemite Valley. E.R. 35, 57.  The
6   occupants of the vehicle were Pedro Borges ("Borges"), the driver, and Holly Wazelle
7   ("Wazelle"), the defendant in the case.
8       As Foster was getting out of his patrol car, Borges and Wazelle started to get out of the
9   Pontiac. E.R. 38.  Foster told them to "sit back into your vehicle" and both complied. E.R. 38.
10  Foster then approached the vehicle. E.R. 38.  Borges and Foster discussed the accuracy of radar
11  units, a conversation Foster described as argumentative. E.R. 38.  Foster testified that Wazelle
12  "said something along the lines of 'just issue the ticket' or 'if you're going to issue a ticket, just
13  issue it.'" E.R. 39.  Foster returned to his patrol car, where he ran Borges's license through the
14  dispatcher. E.R. 39.  Foster then began to fill out a violation notice, but had to return to the
15  Pontiac for additional information from Borges. E.R. 41.  Foster testified that some driver's
16  licenses do not have all the required information necessary for issuing such a citation, such as
17  phone number, height, or weight. E.R.  42.  After receiving the information he needed, Foster
18  began to tear the citation from the ticket book. E.R. 42.  Foster testified that he had to explain the
19  citation and payment options to Borges in order to complete the stop. E.R. 42-43.
20      Foster testified it was at this time that Wazelle "stepped out of the car moving towards
21  the back of the vehicle." E.R. 42.  Wazelle testified she got out of the car because she felt the
22  traffic stop was completed and she "wanted to see the view." E.R. 71.  Foster estimated that eight
23  to ten minutes had passed from the point he made contact with Borges to the point he attempted
24  to issue the citation. E.R. 44, 55.  Foster further estimated that in his experience, a speed stop
25  normally lasted about fifteen minutes. E.R. 40.  Foster then claims he asked Wazelle to "step
26  back into the vehicle."  E.R. 44.  Wazelle testified that he said "I thought I told you to stay in the
27  car." E.R. 76.  Foster testified that she was "very irate, angry," that she was "raising her arms
28  over her head yelling" and she began to move "very quickly towards the back of the vehicle."

2

E.R. 44.  Wazelle yelled "something along the lines of why aren't you done with us yet." E.R. 44.  Foster began "moving backwards at an angle from the vehicle." E.R. 46.  As he did so he again asked her to "get back into the vehicle." E.R. 47.  Wazelle again did not comply, she cleared the back of the Pontiac with her arms over the top of her head. E.R. 47.  She then yelled at Foster, "What the fuck are you going to do? Shoot me?" E.R. 47.  Wazelle disputes Foster's version of the events, specifically stating she never cursed or raised her arms at Foster. E.R. 77.

      Foster testified she then turned the corner of the vehicle and started towards him. E.R. 47.  Foster dropped his ticket book and "moved into her" taking her left arm. E.R. 47.  Foster alleged he did so because he felt Wazelle was "being aggressive towards [him], and advancing on [him]." E.R. 47.  Foster stated he "needed to control the situation." E.R. 47.  Wazelle denies Foster's allegations and testified that she was grabbed by Foster as she was reaching for the doorhandle of the Pontiac to get back in the car. E.R. 71.  Foster applied a technique known as an "arm bar" to move Wazelle back towards the passenger side of the vehicle.  E.R. 47.  Foster testified that as soon as he made contact with her arm she began "aggressively fighting" with him, "not swinging...but trying to break free." E.R. 48.  Foster decided to "try and use the vehicle." E.R. 48.  He then pushed Wazelle into the Pontiac and used his weight to hold her against the car in an attempt to gain control of her. E.R. 48.  Foster testified that he believed he would have been justified in using "a lot more force." E.R. 49.  He indicated he felt threatened by the situation, and the use of a baton or pepper spray would have been justified. E.R. 49.

      As Foster was attempting to gain control of Wazelle, Borges exited from the driver's side of the vehicle. E.R. 50.  Foster ordered Borges back into the vehicle, and Borges complied. E.R. 50.  Foster then made a radio call asking for assistance because he felt he "wasn't in control of the situation." E.R. 50.  From his position in the driver's seat, Borges made attempts to calm Wazelle. E.R. 71.  Borges told Wazelle to comply with Foster, and that it was "going to be okay." E.R. 72.

      Foster testified that Wazelle began to "calm down some" at the vehicle. E.R. 51.  Foster handcuffed her and told her that he was going to take her back to his patrol car. E.R. 51.  She initially complied, walking with him towards the car. E.R. 51.  About half way to his car she

3

began screaming "I don't want to go with you, just let me go." E.R. 51.  Foster was able to place Wazelle in the rear of his patrol car. E.R. 51.  About this time Ranger Dave Horn arrived on the scene. E.R. 52.  Foster explained the situation, and asked him to inform Wazelle of "what was going on" and conduct a search of her person. E.R. 52.  Foster then picked up his ticket book, and completed the traffic stop by explaining the citation to Borges. E.R. 53.

Wazelle was charged with two citations: interference with a government agent and violating the lawful order of a government agent.  Title 36 C.F.R. §2.32, governing conduct in national parks, states:

> (a) The following are prohibited:
> (1) Interference. Threatening, resisting, intimidating, or intentionally interfering with a government employee or agent engaged in an official duty, or on account of the performance of an official duty.
> (2) Lawful order. Violating the lawful order of a government employee or agent authorized to maintain order and control public access and movement during fire fighting operations, search and rescue operations, wildlife management operations involving animals that pose a threat to public safety, law enforcement actions, and emergency operations that involve a threat to public safety or park resources, or other activities where the control of public movement and activities is necessary to maintain order and public safety.

The case was heard before Magistrate Judge William Wunderlich.  On May 4, 2004, Wazelle moved for dismissal on the grounds that even if all allegations are accepted as true, the allegations fail to establish any violation of law. E.R. 05.  On June 7, 2004, Judge Wunderlich denied that motion, finding it necessary to give "wide discretion to a ranger under these circumstances." E.R. 22.

A bench trial was held on September 22, 2004.  At the close of the Government's case, Wazelle made a Fed. R. Crim. Proc. 29 motion for judgment and acquittal, and submitted a written memorandum in support thereof. E.R. 58, 120-129.  Magistrate Judge Wunderlich denied the motion, citing officer safety as a valid reason for Foster's actions. E.R. 66-67.  Wazelle renewed the motion during the closing argument.  At the end of trial, Judge Wunderlich said "I find you guilty of both charges....I find that you did disobey a lawful order given by an officer who had the authority to make the order....I will find you interfered with the officer in violation of 36 C.F.R. 2.32(a)(1)....And you can violate this law a lot of different ways, be interfering, or resisting, or- I find you interfered." E.R. 116:5-21.  On December 7, 2004, Judge Wunderlich

ordered Wazelle to pay a fine of $480 and a $20 penalty assessment. E.R. 130.  Wazelle filed a timely appeal to this court on December 17, 2004.

## II. Legal Standards

Jurisdiction to hear an appeal of a criminal conviction from a magistrate court is proper under 18 U.S.C. §3402.  Issues of law are reviewed de novo. Chevron USA Inc. v. Bronster, 363 F.3d 856, 855 (9th Cir. 2004).  The court must consider the matter anew, the same as if it had not been heard before, and as if no decision previously had been rendered. Ness v. Commissioner, 954 F.2d 1495, 1497 (9th Cir. 1992).  Thus, when considering issues of law no deference is owed to the lower court. Rabkin v. Oregon Health Sciences Univ., 350 F.3d 967, 971 (9th Cir. 2003).

A lower court's findings of fact are reviewed under the clearly erroneous standard. United States v. Holler, 411 F.3d 1061, 1065 (9th Cir. 2005).  Review under the clearly erroneous standard is significantly deferential, requiring a "definite and firm conviction that a mistake has been committed." Easley v. Cromartie, 532 U.S. 234, 242 (2001); Lentini v. California Center for the Arts, Esccondido, 370 F.3d 837, 843 (9th Cir. 2004).  If the lower court's account of the evidence is plausible in light of the record viewed in its entirety, the court hearing the appeal may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. S.E.C. v. Rubera, 350 F.3d 1084, 1094 (9th Cir. 2003); Husain v. Olympic Airways, 316 F.3d 829, 835 (9th Cir. 2002).  Special deference is paid to a trial court's credibility findings. Anderson v. City of Bessemer, 470 U.S. 564, 573 (1985).  The trial court's ruling on the credibility of a witness is reviewed for clear error. McClure v. Thompson, 323 F.3d 1233, 1241 (9th Cir. 2003).  As the Ninth Circuit has described, "[t]o be clearly erroneous, a decision must strike us as more than just maybe or probably wrong; it must...strike us as wrong with the force of a five-week-old unrefrigerated dead fish." Hayes v. Woodford, 301 F.3d 1054, 1067 n.8 (9th Cir. 2002), quotations omitted.

The denial of a motion to dismiss based on violation of constitutional rights is reviewed de novo. United States v. Ubaldo -Figueroa, 364 F.3d 1042, 1047 (9th Cir. 2004).

### III. Discussion

Appellant Wazelle presents the following questions for review:

1. Did the magistrate court err in denying Ms. Wazelle's pretrial motion to dismiss when statements of probable cause failed to charge the essential elements of any offense?
2. Did the magistrate court err in denying Ms. Wazelle's motion for judgment of acquittal and finding her guilty of interfering with a government agent and failing to obey a lawful order when the evidence was legally insufficient to establish either offense?
3. Did the magistrate court's verdict, based in part on the judge's belief that, if Ms. Wazelle's version of events were true, she would have videotape evidence to prove it, violate Ms. Wazelle's due-process rights by impermissibly shifting the burden of proof onto her to come forward with missing evidence?

Doc. 16, Appellant's Brief, at 1:5-13.  Formally, she challenges the proceedings which resulted in her convictions at three procedural junctures.  The appeal makes several substantive arguments that do not coincide cleanly with those procedural points.  Wazelle summarizes her argument as follows:

> Ms. Wazelle did not violate §2.32(a), as a matter of law, because the order given by Ranger Foster to remain in the vehicle was neither lawful nor given in the performance of his official duties....Rather, Ranger Foster's repeated orders to Ms. Wazelle to remain in the vehicle constituted an unlawful seizure of her under the Fourth Amendment....The giving of such an order [to stay in the car] by a law enforcement officer, in the absence of probable cause or another constitutionally permissible justification was patently illegal. That Ms. Wazelle refused to remain in the automobile throughout the duration of the traffic stop could not be a basis for her conviction because she had a clearly established Fourth Amendment right to do so. That she verbally challenged her arresting officer's authority could not be a basis for her conviction because she had a clearly established First Amendment right to do so. Accordingly, the magistrate court erred in denying Ms. Wazelle's motion to dismiss and motion for judgment of acquittal and convicting her of the crimes charged. The court also impermissibly shifted the burden of proof only Ms. Wazelle when it convicted her because she did not present videotaped evidence disproving the Government's version of events.

Doc. 16, Appellant's Brief, at 8:15-9:5.  In effect, Wazelle argues that the pretrial motion to dismiss and the motion for judgment of acquittal should have been granted because neither Foster's order to stay in the car nor Wazelle's verbal challenge to Foster could legally constitute a basis for either of the convictions.  Second, the Government presented insufficient evidence to sustain a conviction.  Separately, Wazelle argues that Judge Wunderlich's comments demonstrate he improperly shifted the burden of proof onto the defense.

**A. Legal Basis For Charges**

The first question for review asks if the facts as alleged by the Government give rise to

chargeable offenses.  Though Wazelle's briefing regarding the pretrial motion to dismiss only addresses the legal sufficiency of the 36 C.F.R. §2.32(a)(2) charge, both charges will be examined as a necessary precursor for subsequent analysis.  Issues of law are reviewed de novo. Chevron USA Inc. v. Bronster, 363 F.3d 856, 855 (9th Cir. 2004).

**1. 36 C.F.R. §2.32(a)(2), Violating A Lawful Order**

Title 36 C.F.R. §2.32(a)(2) prohibits "Violating the lawful order of a government employee or agent authorized to maintain order and control public access and movement during...law enforcement actions."  Wazelle does not dispute that Foster was giving Borges a speeding ticket, a law enforcement action, when he gave Wazelle the order to get back in the car. Wazelle argues that "The dispositive question was whether Ms.Wazelle's conduct before Ranger Foster ordered her back into the vehicle and, ultimately, restrained her physically, violated any law. If not, Ranger Foster lacked the lawful authority to issue his order, and Ms. Wazelle, therefore, could not be guilty of a crime even if she violated it." Doc. 16, Appellant's Brief, at 12:19-23.  Fundamentally, Wazelle challenges Foster's legal authority to order her, a passenger, to get back in the car.

The U.S. Supreme Court has adopted a per se rule that "an officer initiating a traffic stop may order passengers out of a vehicle pending completion of the stop." Maryland v. Wilson, 519 U.S. 408, 409 (1997).  Subsequent to the briefing of this appeal, the Ninth Circuit issued a new opinion establishing a per se rule that an officer can confine a passenger to the stopped vehicle. United States v. Williams, 419 F.3d 1029, 1034 (9th Cir. 2005) ("under the Fourth Amendment it is reasonable for an officer to order a passenger back into an automobile that he voluntarily exited because the concerns for officer safety originally announced in Wilson, and specifically the need for officers to exercise control over individuals encountered during a traffic stop, outweigh the marginal intrusion on the passenger's liberty interest").  When a vehicle is lawfully stopped the passenger is "for the time being, going nowhere." Ruvalcaba v. City of Los Angeles, 64 F.3d 1323, 1327 (9th Cir. 1995).  Foster was on patrol alone and testified that he felt safety was a concern. E.R. 45.  The new decision clearly states that an officer has the legal authority to

7

order a passenger to remain/get back into a car during a traffic stop, especially when safety is at issue. Foster's order, and Wazelle's noncompliance, provide the legal basis for the 36 C.F.R. §2.32(a)(2) charge.

**2. 36 C.F.R. §2.32(a)(1), Interference With Government Agent Performing An Official Duty**

Title 36 C.F.R. §2.32(a)(1) prohibits "Threatening, resisting, intimidating, or intentionally interfering with a government employee or agent engaged in an official duty, or on account of the performance of an official duty." In the initial citation, Foster says that Wazelle "interfered with the issuance of the citation by exiting the vehicle, failing to obey a lawful order and then resisted as I tried to control her first through verbal orders and then through the use of physical restraints." E.R. 1. In closing argument, the Government said "I don't think there could be any doubt that the defendant resisted, and intentionally interfered with issuance of the citation. She also arguably threatened the officer, or intimidated him at the very least." E.R. 108:6-9. Judge Wunderlich's oral ruling does not state what actions constituted the interference. However, he specifically noted that Wazelle only interfered with the officer. E.R. 116:11-21 ("you can violate this law a lot of different ways, by interfering, or resisting, or- I find you interfered"). On appeal, the Government states "The defendant's conduct in this case was unreasonable, and it interfered with Ranger Foster's issuance of a citation." Doc. 19, Appellee's Brief, at 11. With this background, the court examines whether the Government's allegations sufficiently state an intentional interference charge. Allegation of facts that support charges of threatening, resisting, or intimidating but not intentionally interfering are immaterial given Judge Wunderlich's verdict. Though such allegations may support the initial legal charge (in determining whether the pretrial motion to dismiss was properly denied), given the ultimate verdict, the narrower scope is more analytically useful.

In discussing a separate regulation concerning public lands (36 C.F.R. §261.3), the Ninth Circuit consulted Webster's New World Dictionary to defined "interfere" as to "oppose, intervene, hinder, or prevent." United States v. Willfong, 274 F.3d 1297, 1301 (9th Cir. 2001). Title 36 C.F.R. §261.3(a) prohibits "Threatening, resisting, intimidating, or interfering..." In an

opinion dealing with 36 C.F.R. §2.32(a)(1), the Ninth Circuit then cited to the Willfong definition without mention of any distinction between "intentionally interfering" and "interfering" but noting that conviction "requires proof of a specific intent to interfere." United States v. Bucher, 375 F.3d 929, 932 and 934 (9th Cir. 2004).  The Government presents the acts that constitute interference as follows: "The defendant chose to exit a vehicle, defy Ranger Foster's two requests to return to the vehicle, and continued to proceed toward Ranger Foster. She put her hands in the air and began yelling after he gave her a lawful order to return to the vehicle. The defendant deliberately disobeyed Ranger Foster's order, proceeded toward him, and force him to cut short his explanation of the citation that he was still in the process of issuing." Doc. 19, Appellee's Brief, at 11.

  Wazelle makes two arguments.  First, she reiterates her contention that the order to return to the vehicle was unlawful and therefore her refusal of the order can not be the basis of any crime.  As discussed above, the order was lawful.  Second, insofar the charge rests on her alleged verbal protest "What are you going to do, shoot me?" she raises First Amendment concerns. See Doc. 16, Appellant's Brief, at 20:7-9.  "[T]he First Amendment protects verbal criticism, challenges, and profanity directed at police officers unless the speech is 'shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.'" United States v. Poocha, 259 F.3d 1077, 1080 (9th Cir. 2001), quoting City of Houston v. Hill, 482 U.S. 451, 461 (1987).  "[M]ere remonstrances or even criticisms of an officer are not usually held to be the equivalent of unlawful interference." United States v. Willfong, 274 F.3d 1297, 1302 (9th Cir. 2001), quoting District of Columbia v. Little, 339 U.S. 1, 6 (1950) (discussing D.C. regulation which prohibited interfering with a health officer performing an inspection).  The content of Wazelle's alleged statement can not be the basis of the interference charge.  At base, it constitutes remonstrance and criticism of Foster.  Nevertheless, Wazelle's overall actions can be considered in ascertaining whether she had specific intent.

  In determining the sufficiency of the legal theory of the charge, the acts to be considered are Wazelle's exiting the vehicle, refusing to return to the vehicle, and walking toward the driver's side of the car.  Thus viewed, these are essentially the same acts that sustain the violating

a lawful order charge. Indeed the Government asserts "failure to obey a lawful order by a ranger constitutes an 'interference' in violation of 26 C.F.R. §2.32(a)(1)." Doc. 19, Appellee's Brief, at 11. The precise relationship between 36 C.F.R. §2.32(a)(1) and §2.32(a)(2) is not altogether clear. The Bucher and Willfong decisions generally touch on these matters without coming to any firm conclusions. Judge John Noonan participated and wrote important dissents in both cases.

In Willfong, the defendant was convicted of interfering with a Forest Service officer under 36 C.F.R. §261.3(a); the overall section (36 C.F.R. §261.3) does not contain a separate provision criminalizing the violation of a lawful order. The majority opinion determined that "a logger's refusal to desist logging operations on Forest Service land, after a Forest Service Law Enforcement Officer ordered him to do so at the behest of the Forest Service representative authorized to shutdown the logging operation, constitute[s] 'interfering with any forest officer engaged in or on account of the performance of his official duties in the protection, improvement, or administration of the National Forest System' under 36 C.F.R. §261.3(a)." United States v. Willfong, 274 F.3d 1297, 1298-99 (9th Cir. 2001). In dissent, Judge Noonan noted that other Title 36 regulations, covering agencies besides the Forest Service, had separate provisions criminalizing both interference with official duties and violation of lawful orders: "In the court's extraordinarily strained interpretation, 'to interfere' is equated with 'to fail to obey an officer.' That meaning is not only contrary to the plain meaning of 'interfere,' it is at war with the regulations read as a whole....In the face of this careful drafting that repeatedly distinguishes failure to obey from interfering, the court goes far beyond its function in creating a regulation that equates 'failure to obey' and 'interfere.'" United States v. Willfong, 274 F.3d 1297, 1305-6 (9th Cir. 2001), dissent.

In Bucher, park rangers were waiting at a trail head to arrest a suspect who was part of a group hiking the trail. The defendant, not the suspect but part of the same group, finished the hike first and encountered the park rangers at the trail head. The park rangers specifically ordered him not to go back on the trail. He violated that order and warned the suspect of the presence of park rangers. For these actions the defendant was charged and convicted under 36

C.F.R. §2.32(a)(1). United States v. Bucher, 375 F.3d 929, 931 (9th Cir. 2004).  The defendant, relying on the Willfong dissent, argued that violating an order could not constitute interfering. The majority rejected the argument, accepting the Willfong majority's position.  In discussing the issue, the Bucher majority noted "Since the terms [threatening, resisting, intimidating, and intentionally interfering] denote separate and distinct criminal acts, another interpretation rule is invoked which requires the regulation to be read so that none of its terms are rendered redundant. Bucher's reading of § 2.32(a)(1) conflates 'interfering' and 'resisting' so that they would cover essentially the same conduct." United States v. Bucher, 375 F.3d 929, 933 (9th Cir. 2004). Applying that same logic, the question arises as to whether the act of disobeying an order alone can give rise to convictions under both 36 C.F.R. §2.32(a)(1) and §2.32(a)(2).  If any violation of a lawful order necessarily constitutes interference, this interpretation of the law might render the violation of a lawful order provision redundant.  Bucher did not deal with this issue as the defendant was only charged with a violation of 36 C.F.R. §2.32(a)(1).  "Whatever the overlap between Subsections (a)(1) and (a)(2), Bucher's argument is flawed. It wrongly assumes that his failure to obey was the sole basis for his conviction. Bucher not only disobeyed Ranger Boxx. He walked a quarter mile down the trail and spoke to the target of the rangers' investigation." United States v. Bucher, 375 F.3d 929, 933 (9th Cir. 2004).  Since the ranger only ordered the defendant not to return to the trail and did not specifically order him not to warn the suspect, the defendant's act of warning is a significant action that supports the interference charge on its own.

While Judge Noonan decried the Willfong majority's holding that disobeying a lawful order constituted interference, he implicitly accept this very equivalence in his Bucher dissent: "If Gabriel Bucher, after speaking to the ranger [who ordered him not to return to the trail], has turned around to walk back farther down, and never reached his elderly friend Robert Jacobs, he might have been charged with disobeying the ranger's lawful order and conceivably he might have been charged with attempting to interfere with the ranger's performance of official duty." United States v. Bucher, 375 F.3d 929, 934 (9th Cir. 2004), dissent.  Judge Noonan uses "and" instead of "or," implying that the defendant could have been charged with both attempting to interfere and violating a lawful order based on the single act of returning on the trail.

Presumably, Judge Noonan's concern in the Willfong dissent was not with the possibility of redundancy but rather with the limited language used in 36 C.F.R. §261.3.

Whether disobeying a lawful order is sufficient in and of itself, to constitute violations of both 36 C.F.R. §2.32(a)(1) and §2.32(a)(2) has not been settled by the Ninth Circuit. The parties have not raised this issue. At this point, the court accepts the contention that Wazelle's actions in disobeying Foster's order is also the basis for the 36 C.F.R. §2.32(a)(1) charge.

**B. Sufficiency Of Government's Evidence**

The second question for review asks if the Government presented enough evidence at trial to convict Wazelle of the charges. As the discussion above explains, the overt act sustaining both convictions is Wazelle's violation of the orders to return to her car. A lower court's factual findings must be reviewed for clear error and should be affirmed if the "view of the evidence is plausible in light of the record viewed in its entirety." S.E.C. v. Rubera, 350 F.3d 1084, 1093-94 (9th Cir. 2003).

The Government's case consisted solely of Foster's testimony. Foster testified that he stopped the vehicle Borges and Wazelle were in on a speeding violation. As they initially exited the vehicle, he ordered them to get back in and they complied. E.R. 38:4-13. Foster testified that when he is patrolling alone, he finds keeping people in the car to be the safer option as long as he does not suspect the presence of a weapon in the car. E.R. 45:3-14. Before he physically gave the ticket to Borges, Wazelle exited the vehicle. E.R. 43:24-44:1. Foster said that he "asked her to step back into the vehicle, which she didn't do. She started yelling at me. She was very irate, angry. She was raising her arms over her head yelling, and she started moving very quickly towards the back of the vehicle....At that point she yelled something along the lines of why aren't you done with us yet?....I asked her again to sit back into the- to get back into the vehicle. As she cleared the back of the Pontiac, her arms were over the top of her head, and she was yelling at me, 'What the fuck are you going to do? Shoot me?'" E.R. 44:6-13 and 47:1-4. At that point, Foster testified that he physically restrained her. E.R. 47:13-48:3. He handcuffed Wazelle and put her in the back seat of the patrol car. E.R. 51:6-20. Foster insisted that he had given "At a

12

minimum, two commands" to return to the car. E.R. 100:16-23.

The defense case consisted of Wazelle's and Borges's testimonies. Their account contradicts Foster's on several points. Wazelle testified that he only told her to return to the car once, using the phrase "I thought I told you to stay in the car." E.R. 71:6 and 76:10-25. She said that she then tried to comply with the order, but was physically restrained by Foster before she could reenter the car. E.R. 71:7-9 and 77:1-4. Wazelle specifically denied making any statements like "Why aren't you done with us or "What are you fucking going to do? Shoot me?" to Foster. E.R. 77:8-15. Borges said that Wazelle made no comments to Foster, but admitted that he could only see them and could not hear them as the windows were up. E.R. 89:16-19 and 92:20-23.

Based on this testimony, Judge Wunderlich could have believed Foster's version of the events. Foster was in the process of issuing a speeding ticket. When Wazelle exited the vehicle the second time, Foster told her to return to the vehicle more than once. She did not comply and instead began to go around the car to the driver's side. "Culpable intent can be inferred from the defendant's conduct and from the surrounding circumstances." United States v. Bucher, 375 F.3d 929, 934 (9th Cir. 2004), citations omitted. Judge Wunderlich could have concluded Wazelle violated the orders to return to the car and intentionally interfered with the traffic stop by hindering Foster's issuance of a speeding ticket. "When a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding can virtually never be clear error." Conrad v. United States, 447 F.3d 760, 768 (9th Cir. 2006), quoting Anderson v. City of Bessemer, 470 U.S. 564, 573 (1985).

**C. Burden Shifting**

The third question for review asks if Judge Wunderlich shifted the burden of proof onto the defense in a criminal proceeding. "[A]n oppressive shifting of the burden of proof to a criminal defendant violates due process." Engle v. Isaac, 456 U.S. 107, 133 (1982). Determining whether a trial judge has shifted the burden of proof onto the defense is subject to de novo review. United States v. Coutchavlis, 260 F.3d 1149, 1156 (9th Cir. 2001), citing Dickey v.

Lewis, 859 F.2d 1365, 1370 (9th Cir. 1988).

    Wazelle makes two distinct burden shifting arguments.  First, she claims Judge Wunderlich did not properly hold the Government to its burden of showing the order to remain in the car was lawful and given in the performance of official duties, effectively requiring Wazelle to demonstrate the order was unlawful and/or not given in the performance of official duties.  Doc. 16, Appellant's Brief, at 23:3-6.  Wazelle cites no evidence to back this argument nor explains how the record reflects this interpretation of events.  The Government does not address the issue in its brief, and Wazelle does not return to this argument in her reply.  In the context of the overall appeal, the court finds this argument simply repeats Appellant's assertion that the order to return to the car could not constitute the basis of Wazelle's convictions.

    The second argument is more substantial.  Wazelle cites to Judge Wunderlich's oral remarks in handing down his verdict:

> There's a very clear bright line here. Either the statement about what are you going to do, or what are you fucking going to do, or whatever it was, are you going to shoot me? Either it was made or it was not. I find it was made. And the reason I'll tell you my thinking on this. This happened in front of 200 people, and in the post-Rodney King era, people are not afraid to take movies of police officers that they think are engaging in wrong conduct. You've got 200 tourists there, probably half of them with video cameras, and if this officer was slamming you around as you say he was and acting unreasonably, there would be a movie to that effect. And this statement about "What are you going to do? Shoot me?" is such an incredibly unusual statement that for this officer to make that up and put his career on the line knowing there's 200 people standing there, and if it wasn't said, one of them would come forward and claim that, these things don't happen that way. In my experience, and I've been doing this for 20 years now, things don't happen that way.

E.R. 115:11-116:4.  Wazelle argues Judge Wunderlich effectively said that "if Ms. Wazelle's version of events were true 'someone' would have (1) videotaped the arrest; (2) located Ms. Wazelle, who had been taken into law enforcement custody, either while still on vacation in Yosemited National Park or after returning home, possibly to a foreign place of residency; and (3) provided her with a copy of the tape and/or testimony to use at trial." Doc. 16, Appellant's Brief, at 23:16-20.

    The Government urges adherence to United States v. Robinson, 20 F.3d 1030, 1033 (9th Cir. 1994) and Ellison v. Shell Oil Co., 882 F.2d 349, 352 (9th Cir. 1989) which prescribe review of "the written opinion of the lower court and not the court's oral statements." Doc. 19,

Appellee's Brief, at 16.  In both those cases, there was a formal written opinion in addition to oral comments.  As the Government must be aware, there is no written opinion explaining the verdict in this case; all we have are the oral statements.  Where there is no formal written opinion, a court entertaining an appeal has no choice but to review a trial court's oral findings of fact.  The review, however, is not as exacting as when a formal written decision is presented. See United States v. Coutchavlis, 260 F.3d 1149, 1156 (9th Cir. 2001) ("The magistrate judge's words, however, need not be read so literally. On appeal, our task is not to formally parse the sentences contained in a transcript of an oral ruling or to demand absolute linguistic precision from the trial judge. Rather, we must assure ourselves that the court did not tread on [the defendant's] constitutional rights").

In Coutchavlis, the Ninth Circuit concluded there was no burden shifting:

> The magistrate judge's statement in the first paragraph- "There has been no contrary evidence presented, so the court will find as a fact that he did punch out the windshield" - presents a closer question. [The defendant] argues that the word "so" underscores the court's shifting of the burden. It is indeed possible to read the sentence as saying, "Because the defendant failed to present any contrary evidence, I therefore must find that he did punch out the windshield." Read this way, it would seem to place the burden on the defendant to come forward with evidence disproving the prosecution's case....Read in the context of the entire trial, it is more reasonable to interpret the magistrate judge's comment as meaning something like: "I have just finished a trial that included credible testimony that [the defendant] punched the window. There was no evidence presented that would lead me to doubt that testimony. I therefore find as a fact that he did punch the window." That the magistrate judge did not orally explain his reasoning with the precision that might be expected from a written decision is not sufficient reason to conclude that he placed the burden on the defendant to prove his innocence.

United States v. Coutchavlis, 260 F.3d 1149, 1156-57 (9th Cir. 2001).  Judge Wunderlich's statements can be similarly construed.  Though the language used was unfortunate, it does not necessarily indicate that he assumed Wazelle's guilt, requiring her to bring forth evidence of her innocence.  Rather it could be interpreted as stating the Government met its burden, and noting that there was no evidence that would lead him to entertain a reasonable doubt in this case.  Both Wazelle and Foster gave testimonies that are internally coherent and facially plausible.  Judge Wunderlich's credibility assessment in favor of Foster must be given deference by a reviewing court.  Conrad v. United States, 447 F.3d 760, 768 (9th Cir. 2006).

Most of the cases Wazelle cites deal with jury instructions defining presumptions and inferences.  Where a bench trial is held, the examination of jury instructions is of limited value.

In general, the use of inferences do not upset the criminal justice structure. "The most common evidentiary device is the entirely permissive inference or presumption, which allows -- but does not require -- the trier of fact to infer the elemental fact from proof by the prosecutor of the basic one and which places no burden of any kind on the defendant....Because this permissive presumption leaves the trier of fact free to credit or reject the inference and <u>does not shift the burden of proof</u>, it affects the application of the 'beyond a reasonable doubt' standard only if, under the facts of the case, there is no rational way the trier could make the connection permitted by the inference." <u>County Court v. Allen</u>, 442 U.S. 140, 157 (1979), emphasis added.

Further, the cases cited do not speak to the specific factual situation at hand. Wazelle, at base, calls into question Judge Wunderlich's conclusion that "the lack of the presentation of videotaped evidence (by either party) bolstered the Government's version." Doc. 20, Appellant's Reply, at 13:1-3. The situation is akin to that of a witness available to all that neither side calls to testify.[2] The missing witness instruction generally used in the Ninth Circuit comes from Devitt and Blackmar: "If it is peculiarly within the power of either the government or the defense to produce a witness who could give relevant testimony on an issue in the case, failure to call that witness may give rise to an inference that this testimony would have been unfavorable to that party. <u>No such conclusion should be drawn by [the jury], however, with regard to a witness who is equally available to both parties</u> or where the testimony of that witness would be merely cumulative. The jury must always bear in mind that the law never imposes on a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence." See <u>United States v. Tisor</u>, 96 F.3d 370, 377 (9th Cir. 1996), emphasis added; <u>United States v. Bramble</u>, 680 F.2d 590, 591-92 (9th Cir. 1982). In the Second Circuit, "[the defendant] complains about the court's charge that <u>failure to call a witness equally available to both parties permits an inference against either</u>. He argues that this charge in a criminal case 'upset the burden of proof and violated the presumption of innocence.' But as counsel recognizes, such charge has been

---

[2]The missing witness instruction is relevant as Judge Wunderlich pointed out that bystanders were potential witnesses who were not called to testify. See 116:1-2 ("there's 200 people standing there, and if it wasn't said, one of them would come forward and claim that").

**16**

expressly approved by this Court." <u>United States v. Ploof</u>, 464 F.2d 116, 119 (2nd Cir. 1972), emphasis added.  Concurring with the Second Circuit position, Wright and Miller counsels that "Where an absent witness is readily available to both sides, it is permissible to instruct that no inference is to be drawn against either party from the fact that the witness has not been called. Generally, however, the better practice is to say that the jury, having before it the facts with regard to the availability of the witness and his or her relation to the parties, may draw such inferences as they choose." 2A Charles Wright, Federal Practice And Procedure §489 (3rd ed. 2000).  Drawing an inference from missing witnesses or evidence arguably available to both sides does not shift the burden of proof.

### IV. Conclusion

Defendant's appeal of the Magistrate Judge's decision is DENIED.

IT IS SO ORDERED.

**Dated:   August 30, 2006**          **/s/ Anthony W. Ishii**
0m8i78                                                  UNITED STATES DISTRICT JUDGE